**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JUNE O. CARLSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 06 |
| | ) |
| SCOTT BUKOVIC and the CITY OF DARIEN, | ) Judge Nan R. Nolan |
| an Illinois Municipal Corporation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff June O. Carlson filed suit against Officer Scott Bukovic and the City of Darien,

Illinois, alleging unreasonable seizure in the nature of an assault and battery, and failure to train

resulting in unreasonable seizure, all in violation of 42 U.S.C. § 1983. The parties have consented

to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have

now filed cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion

is denied and Defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

Ms. Carlson ("June") lives in DuPage County, Illinois with her disabled adult son, Paul. (Def.

Facts ¶¶ 1, 5.)[2] Officer Bukovic works as a police officer for the City of Darien. (*Id.* ¶¶ 2, 3.) During

the course of his career, Officer Bukovic attended the Indiana State Academy, the Illinois State

---

[1]     Plaintiff's Local Rule 56.1 Statement of Material Facts essentially mirrors Defendants' Local Rule 56.1 Statement. Plaintiff's response to Defendants' 56.1 Statement, however, contains numerous denials and additional, contradictory facts. Notwithstanding Plaintiff's apparent concession as to the veracity of Defendants' version of events, the court has reviewed and considered all relevant factual statements and responses in addressing the cross-motions for summary judgment. *See Hardwood Line Mfg. Co. v. Whyco Technologies, Inc.*, No. 99 C 2467, 2000 WL 294832, at *8 n.8 (N.D. Ill. Mar. 21, 2000) ("[T]he Court, viewing all of the facts and reasonable inferences in a light most favorable to [the plaintiff], must consider the disputes raised by [the plaintiff's] properly supported denials of [the defendant's] statements of facts.")

[2]     Defendants' Statement of Facts in Support of their Motion for Summary Judgment is cited as "Def. Facts ¶ __."

Police Academy, and a California police academy. He also worked with the Lake County, Indiana Sheriff's Department; the Westmont Police Department; and the California Highway Patrol before accepting the position with the Darien Police Department. (*Id.* ¶¶ 88, 89.)

On January 3, 2005, June, who was then 83 years old, and Paul, who was 59 years old, went shopping at the Wal-Mart store in Darien, Illinois. Once at the store, the two separated to shop for their own items. (*Id.* ¶¶ 7, 8; Pl. Facts ¶¶ 1, 5.)[3] When Paul was finished, he started to look for his mother. As he was pushing his cart around the store, Paul brushed up against a fire hose box that had a sharp edge exposed on the bottom corner, and cut his arm. He went looking for a store manager to report the accident and found assistant manager Dale Hardiek. (*Id.* ¶¶ 8-10; Pl. Facts ¶¶ 8-10.) Paul told Hardiek about his injury and showed him the fire hose box. Hardiek escorted Paul to the personnel office located near the layaway area of the store and reported the incident to the personnel manager, Sue Katsaros. Hardiek then started to prepare an accident report, asking Paul to provide the relevant information. (*Id.* ¶¶ 10-12.)

By this time, someone had notified store co-manager, Brandon Hunter, about the incident, and he went to the personnel office. Paul told Hunter what happened but insisted on speaking to the store manager. Paul also wanted his mother with him to assist in communicating with Wal-Mart personnel. Paul is hard-of-hearing and was not wearing his hearing aids that day due to the damp weather. (*Id.* ¶¶ 13, 14; Pl. Facts ¶¶ 13, 14.) Katsaros paged June over the store's intercom system, contacted store manager Stacey Johnson, and then tried to administer first aid to Paul's cut. Paul, however, did not like the first aid kit because it was in a white plastic box that looked to him like "junk" and "a mess." (*Id.* ¶¶ 15, 16, 17; Paul Dep., Ex. C1, at 26-17; Katsaros Dep., Ex. E, at 23-24.)[4] Everyone present in the room agrees that Katsaros attempted to clean Paul's arm with

---

[3]    Plaintiff's Statement of Facts in Support of her Motion for Summary Judgment is cited as "Pl. Facts ¶ __."

[4]    Lettered exhibits are attached to Defendants' Statement of Facts.

iodine and that Paul objected because he is diabetic and allergic to it. Paul says Katsaros used it on his arm anyway; Katsaros denies this. Regardless, it is undisputed that Katsaros either offered or placed a Band-Aid on Paul's arm. (*Id.* ¶ 18; Pl. Fact Resp. ¶ 18.)[5]

## A. June's Interaction with Wal-Mart Personnel

Shortly thereafter, June arrived in the personnel office and Paul told her what had happened. Katsaros also tried to explain the situation. (*Id.* ¶ 20.) Katsaros says that June was shocked and became upset and animated about the type of medical treatment Paul had received. Indeed, June later testified that the office was filthy and she was concerned that Paul's wound might become infected. (Pl. Add'l Facts ¶ 17.1.)[6] Katsaros was surprised by June's reaction to what she believed was a relatively minor cut that did not warrant calling an ambulance or require stitches. June and Paul insist that June remained calm while expressing concern about her son's injury. They also claim that the cut was actively bleeding and had rendered Paul "white as a ghost and shaking." (Def. Facts ¶¶ 19, 21, 22; Pl. Fact Resp. ¶¶ 19, 21, 22.)

At some point during this period, Stacey Johnson arrived in the personnel office. Hardiek was sitting at a table with Paul obtaining information about the incident for a store report. Paul had also been asked to complete a separate report describing the accident. Paul asked June to help him, but Johnson explained to June that store policy required that the statement be in Paul's own words. (*Id.* ¶¶ 23-25.) Johnson also told Katsaros, Hardiek and Paul that they needed to complete the reports in the layaway area.[7] According to Johnson, customers are not authorized to be in the personnel office (though they had all been there for approximately 20 minutes) because it was close to the employee locker area where there was often clothing and fixtures hanging from the ceiling.

---

[5] Plaintiff's Response to Defendants' Statement of Facts is cited as "Pl. Fact Resp. ¶ __."

[6] Plaintiff's Statement of Additional Facts is cited as "Pl. Add'l Facts ¶ __."

[7] Store co-manager Brandon Hunter had apparently left the office. (Def. Facts ¶ 27.)

Johnson worried about liability issues if a customer were injured while in an unauthorized area. (*Id.* ¶ 26.)

Everyone proceeded to the layaway department, an area at the back of the store where customers can purchase items on layaway. The area is separated from the main shopping floor by a large 12- to 16-foot-wide opening. (*Id.* ¶ 28.) June stated that she wanted copies of all the documents that were being generated in connection with her son's injury. Katsaros says that June was still upset, becoming more so, and talking in a louder and louder voice. (*Id.* ¶ 29.) Johnson informed June that store policy only authorized the release of Paul's written statement. By this time, Hardiek had returned to the sales floor because it was a busy time in Wal-Mart's shopping season. Paul started looking at Hardiek's report, but Johnson took it away from him. She wrote down the 800 number for the claims department, explaining that this department was responsible for determining which reports the Carlsons could have. (*Id.* ¶¶ 30-33.)

Katsaros says that June was upset and loud in the layaway department and could be heard for quite a distance. June disagrees, but she cites only to a page of her deposition transcript where she claimed to be "very calm" while in the personnel office. (*Id.* ¶ 34; Pl. Fact Resp. ¶ 34; June Dep., Ex. 5, at 27.)[8] In any event, it is undisputed that Paul left the layaway department because he wanted to be sure that Hardiek had taken a picture of the fire hose box. Paul found Hardiek placing foam and grey tape around the box as an immediate remedy. (*Id.* ¶ 35.)

When Paul returned to the layaway department, June was still asking questions about the incident and stated that she, too, wanted to see the fire hose box. The Carlsons, Johnson, and Hunter – who had proceeded to the layaway area by this time – all went back to look at the box. (*Id.* ¶ 36.) Everyone then returned to the layaway department so that Paul could complete his statement. The disagreement over which forms would be produced continued, and Paul started

---

[8]     Numbered exhibits are attached to Plaintiff's Response to Defendants' Statement of Facts.

objecting that he wanted to complete his report in the personnel office where there was a place for him to sit down.  (*Id.* ¶¶ 37, 38; Pl. Fact Resp. ¶ 38.)

According to Hunter, Paul and June both continued to act "disorderly" and to overreact to the situation.  In addition, June kept interfering while Paul was preparing his statement.  June disagrees with this assessment, claiming the interaction was "amicable," that she used "no harsh words," and that it was Johnson who interfered with her son's effort to complete his statement by saying uncomplimentary things and threatening to take the statement away.  (*Id.* ¶¶ 39, 40; Pl. Fact Resp. ¶¶ 39, 40; June Dep., Ex. 5, at 35; Pl. Add'l Facts ¶ 39.1; Def. Add'l Facts Reply ¶ 39.1.)[9]

### B.     Paul's Confrontation with Johnson

Paul had apparently obtained a chair for himself by this point, and though he was unable to hear what Johnson was saying to June throughout this time, he stood up at some point and told Johnson in a firm voice, "Don't you talk that way to my mom."  (*Id.* ¶ 41.)  Here, again, there is disagreement as to what occurred.  Paul says that he could tell that Johnson was "mean" to his mother.  (Paul Dep., Ex. 6, at 49.)  He also claims that Johnson was standing behind a counter at the time, and he stepped towards her but did not go behind the counter himself.  Johnson, in turn, stepped back.  (*Id.* at 52-53.)  June adds that Johnson was angry that Paul had spoken firmly to her.  (Pl. Add'l Facts ¶ 41.2.)

Johnson says that Paul pointed his finger at her and stepped towards her while she was in front of the counter.  In fact, she insists that she could not step back from Paul because the counter was behind her.  (Johnson Dep., Ex. G, at 44.)  It is undisputed that Paul is a relatively big man,

---

[9]     Defendants' Reply to Plaintiff's Statement of Additional Facts is cited as "Def. Add'l Facts Reply ¶ __."  Throughout this reply, Defendants repeatedly object that June's testimony is "self-serving as it contradicts the overwhelming evidence to the contrary by non-party, unbiased witnesses and, therefore, should be stricken."  The cases Defendants cite, however, address affidavits.  *See, e.g., Nedzvekas v. LTV Copperweld*, 356 F. Supp. 2d 904, 908 (N.D. Ill. 2005) ("[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are without factual support.") (internal quotations omitted).  To the extent Plaintiff has cited only to deposition testimony, these cases are inapplicable.

and that Johnson is not very tall. (Def. Facts ¶ 42.) According to Johnson, she felt threatened and told Paul, "Please step back. I feel threatened." (Johnson Dep., Exs. G and G1, at 39-40, 89-90.) Johnson claims that June responded, "We're not threatening you," but that she affirmed, "No, I feel threatened. Please step back. I will call the police and have you escorted out." (*Id.* at 40, 89-90.)

At this point, Johnson says, she was able to move through an opening in the counter and get behind it. Johnson remained fearful, however, because Paul made another move towards her as they were discussing which forms could be copied. Johnson again told Paul that she felt threatened and asked him to step back. Paul may or may not have stepped back at this point, but Johnson certainly did. (*Compare* Johnson Dep., Ex. G, at 44-46; Def. Facts ¶ 45 *with* Def. Add'l Facts Reply ¶ 42.1.) Johnson believed that the situation was escalating beyond her control, and either she or another Wal-Mart employee called the police. (Def. Facts ¶¶ 46, 48.)

### C. Officer Bukovic's Arrival

Officer Scott Bukovic and Officer Richard Stutte arrived at the store around 4:52 p.m. after receiving the call that a male and female were being loud or argumentative. (*Id.* ¶ 49.) Officer Bukovic, the primary responding officer, and Officer Stutte, the back-up officer, both responded to the layaway department where they found the Carlsons, Johnson and Hunter. (*Id.* ¶ 50.) Officer Bukovic found June to be calm at this time, and asked Johnson to explain what had happened up to this point. Johnson responded that Paul had injured himself at the store, and told Officer Bukovic that during the more than one-hour process of completing a report, Paul had become very loud and boisterous towards Johnson and pointed a finger at her, making her feel threatened. (Def. Facts ¶ 51; Bukovic Dep., Ex. J, at 44-46; Pl. Facts ¶ 50.1.)

While Johnson was speaking, June kept interrupting her. (*Id.* ¶ 52.) At one point, June made a gesture to get Officer Bukovic's attention, but he turned to her and said, "Hold on a minute. Please don't touch me. Just let this (sic) finish and then we'll move on" or "then we'll talk to you." (*Id.*) June insists that initially, she did not interrupt Johnson. It was only after Johnson accused

6

Paul of threatening her that June started loudly protesting and challenging the statement, at which point Johnson stated that she "felt" threatened by him.  (Pl. Fact Resp. ¶ 52; Pl. Add'l Facts ¶¶ 52.1, 52.2.)  June was admittedly "surprised" at Johnson's accusation, and Johnson and Bukovic both recall that June called Johnson a liar at least twice.  (Def. Facts ¶ 53.)  Officer Bukovic explained to June that he needed to hear Johnson's version of the story first and would then get June's version.  (*Id.* ¶ 54.)

Officer Bukovic next spoke to Paul, who explained how he had received a cut on his arm. Officer Bukovic went out to the sales floor and personally examined the fire hose box at issue. (Def. Facts ¶ 55.)  Paul also told Officer Bukovic that he is hard of hearing and has difficulty speaking.  According to Officer Bukovic, Paul was adamant, vocal and loud, and he used hand gestures to explain his situation.  When Officer Bukovic told Johnson about Paul's hearing problem, she expressed surprise but still maintained that she felt threatened by him.  Officer Bukovic found Johnson to be credible in that regard.  (*Id.* ¶ 56.)

### D.    Officer Bukovic's Interaction with June

The parties offer entirely different versions of what occurred next.  Officer Bukovic says that he asked June to explain what happened, but all she wanted to do was discuss how Johnson was a liar.  June was loud and boisterous such that everyone could hear her.  (*Id.* ¶ 57.)  As a result, Officer Bukovic asked June for her driver's license so that he could determine who he was dealing with.  June asked why she had to provide a driver's license seeing as how she was not involved in the incident.  Officer Bukovic relayed this exchange to Johnson, who stated that Paul could stay and complete his report but that June had to leave the store because she was being disruptive. (*Id.* ¶¶ 58, 59; Pl. Add'l Facts ¶ 58.1.)  Officer Bukovic says that he told June that Wal-Mart management wanted her to leave the store and advised her that he could arrest her for trespass if she refused.  June stated that "this was crazy" and refused to leave.  Officer Bukovic tried three or more times to convince her to leave, but she refused.  (*Id.* ¶¶ 59, 60.)

At this point, according to Officer Bukovic and Katsaros, Officer Bukovic reached for June's right arm and placed one hand on her forearm and one hand on her upper arm. He touched June in a calm, escorting gesture in an attempt to guide her out of the store. Officer Stutte likened the action to one taken to assist a mother or grandmother in a parking lot in inclement weather. (*Id.* ¶ 61.) June, however, "freaked out" and began flailing her arms and yelling "let go of me!" or "don't touch me!" Officer Bukovic grabbed both of her arms in an attempt to prevent her from striking him and to calm her down. June had put her hands up and crossed her arms in front of her chest, causing her arms to be pushed and pulled against her chest in the fray. (*Id.* ¶ 62.) Officer Bukovic claims that he held onto June for no more than five seconds. He never placed her under arrest and never told her that she had to remain in the store; to the contrary, everyone wanted her to leave. (*Id.* ¶ 64.) June finally settled down physically when Paul went to assist her and told her that she should just leave the store. (*Id.* ¶ 63; Paul Dep., Ex. 6, at 82-83.)

June insists that Officer Bukovic never asked for her version of events. Instead, Johnson motioned to Officer Bukovic that she wanted June arrested or removed from the store, at which point Officer Bukovic began demanding June's purse. According to June, Officer Bukovic gestured that he was going to grab June and/or her purse and she kept backing away from him. This made Officer Bukovic very angry and hostile. (Pl. Fact Resp. ¶ 58; Pl. Add'l Facts ¶ 58.1.) June says that Officer Bukovic grabbed her arms, which were crossed at her chest, and she placed them upwards as if to defend herself from an attack. Officer Bukovic then repeatedly "banged" June's wrists against her chest, neck and throat area while kicking at her legs and hitting her once in the groin. (*Id.*; Pl. Add'l Facts ¶ 58.5.) June claims that Officer Bukovic threatened to handcuff her and she kept exclaiming, "Don't touch me!" and screaming for help. Paul came to her assistance, supported her so that she would not fall, and threatened Officer Bukovic with a lawsuit if he did not let go of his mother. Officer Bukovic finally released June, at which point, she says, she was ready to faint and exceedingly white. (*Id.*; Pl. Add'l Facts ¶ 58.7.)

The parties agree that someone brought a wheelchair for June and that Paul obtained permission from Officer Bukovic to get her a cup of water. (Def. Facts ¶ 64; Def. Add'l Facts Reply ¶ 58.11.) Paul claims, however, that as he was filling the cup, Officer Bukovic placed his hand on his service revolver after unlocking the holster. (Pl. Fact Resp. ¶ 58.) Officer Bukovic claims that June declined his offer of medical treatment, but it is undisputed that she went to the Hinsdale Hospital emergency room after she left the store – and after she first made stops at home to change out of her soiled clothing (she urinated in her clothes), and at the Hinsdale police department. (Def. Facts ¶ 65; Pl. Fact Resp. ¶¶ 63, 65; Pl. Add'l Facts ¶ 63.1; Def. Add'l Facts Reply ¶ 63.1.)

### E. Post-Encounter Events

Once June was seated in the wheelchair, Officer Bukovic returned to an assertion Paul had made about suing Wal-Mart. Officer Bukovic explained that Paul could contact Wal-Mart's corporate headquarters to make a complaint, and he gave Paul his name and report number to use as a reference. (Def. Facts ¶ 66.) Officer Bukovic also told Paul that Wal-Mart wanted his mother to leave the store. Paul agreed to take her outside and pushed her in the wheelchair to his truck, with the two officers in tow. (*Id.* ¶ 67.) Paul returned to the store to complete his statement and Officer Bukovic gave him a copy of it. At Johnson's request, Officer Bukovic also gave Paul a "Notification of Restriction from Property" stating that the Carlsons were not permitted to return to the Wal-Mart store. Paul refused to sign it. He purchased the items he and his mother had gathered in their carts and then wheeled them out to the truck. (*Id.* ¶¶ 68, 69.) Officer Bukovic asked if he could accompany Paul to make sure June was okay, but Paul refused. (*Id.* ¶ 70.)

The next day, on January 4, 2005, June telephoned the Darien Police Department to lodge an excessive force complaint against Officer Bukovic. Sergeant Falco investigated the claim by conducting telephone interviews with June, Stacey Johnson and Officer Bukovic. Given the seriousness of the charge, Sergeant Falco advised June that she would also need to complete a

written statement.  (*Id.* ¶¶ 74, 75, 78-80, 82.)  June said that she could not provide one until she felt better.  (*Id.* ¶ 81.)  Over the next few weeks, Sergeant Falco attempted several times to secure a written statement from June, even offering to go to her house.  June repeatedly refused.  (*Id.* ¶¶ 84-86.)  Finally, on April 4, 2005, Sergeant Falco recommended that the investigation be closed and that Officer Bukovic be exonerated.  On April 13, 2005, Deputy Chief David Skala wrote a letter to June advising her of this result.  (*Id.* ¶¶ 86, 87.)

### F.      June's Lawsuit

On January 3, 2007, June and Paul filed suit against Officer Bukovic, the City of Darien, and Wal-Mart Stores, Inc., Wal-Mart Associates, Inc., Wal-Mart Stores East, Inc., and Wal-Mart Realty Company (collectively, "Wal-Mart"), alleging violations of § 1983 (Counts I through IV) and state law claims for negligence, assault, battery, and intentional infliction of emotional distress (Counts V through VIII).   On June 19, 2007, the court dismissed Count II (titled "42 U.S.C. § 1983: Unreasonable Seizure Inflicting Severe Emotional Distress") and Count IV (titled "42 U.S.C. § 1983: Failure to Train Resulting in Unreasonable Seizure in the Nature of Infliction of Severe Emotional Distress") for failure to state claims.  The court also dismissed Counts VI through VIII by agreement of the parties.  (Minute Order of 6/19/07, Doc. 35.)

Shortly thereafter, on October 1, 2007, the court dismissed the sole count asserted against Wal-Mart (Count V), finding the state law negligence claim substantially different from the federal claims asserted against Officer Bukovic and the City of Darien, and declining to exercise supplemental jurisdiction.  (Minute Order of 10/1/07, Doc. 44.)  Thus, there are two remaining claims at issue: (1) Count I (titled "42 U.S.C. § 1983: Unreasonable Seizure in the Nature of Assault & Battery") asserted by June against Officer Bukovic; and (2) Count III (titled "42 U.S.C. § 1983: Failure to Train Resulting in Unreasonable Seizure in the Nature of Assault & Battery") asserted by June against the City of Darien.

### DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering cross-motions for summary judgment, the court must view the evidence in a light most favorable to the party opposing the motion under consideration. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001).

Plaintiff claims that Officer Bukovic seized her unreasonably in violation of § 1983 and her due process rights, and that the City of Darien is liable for Officer Bukovic's actions due to its failure to train him, also in violation of § 1983. In her memorandum in support of summary judgment, Plaintiff additionally raises the issue of whether Officer Bukovic had probable cause to arrest her. (Pl. Mem., at 3-4.) The Complaint does not allege a claim for false arrest, however, and the parties agree that Plaintiff was *not* arrested. (Pl. Facts ¶ 64; Def. Fact Resp. ¶ 64.) To the extent Plaintiff is attempting to insert a new false arrest claim into the case, it will not be considered. *See Killis v. Medieval Knights, LLC*, No. 04 C 6297, 2007 WL 4302470, at *3 (N.D. Ill. Dec. 4, 2007) (court "would not consider a wholly new claim introduced in response to Defendant's motion for summary judgment."); *Davis v. Harris*, No. 03-3007, 2006 WL 3321630, at *37 n.22 (C.D. Ill. Nov. 14, 2006) (plaintiff "does not allege these retaliatory acts in the Complaint and cannot amend his claims through his summary judgment brief.")

Thus, the court addresses Plaintiff's Fourth Amendment, due process and failure to train arguments below.

## I.     The Fourth Amendment

### A.     Seizure

The parties first dispute whether Officer Bukovic effected a seizure of June on January 3, 2005.   The Fourth Amendment – which is made applicable to the states by the Fourteenth Amendment – protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV; *Jewett v. Anders*, 521 F.3d 818, 820-21 (7th Cir. 2008); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). A Fourth Amendment seizure occurs whenever a police officer "by means of physical force or show of authority . . . in some way restrain[s] the liberty of a citizen . . . ."  *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  As the Supreme Court recently explained, a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Where physical force is involved, a seizure occurs "[w]henever an officer restrains the freedom of a person to walk away."  *Acevedo*, 457 F.3d at 724 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

Defendants argue that no seizure occurred here because Plaintiff at all times remained free to walk away – in fact, Officer Bukovic and Wal-Mart personnel wanted her to leave the store.  (Def. Mem., at 3.)  Defendants agree that police officers do not have a right to "shove, push, or otherwise assault innocent citizens without any provocation whatsoever."  (*Id*. at 4 (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (citation omitted)).   They stress, however, that even some unreasonable, unjustified or outrageous conduct "may simply violate state tort law or indeed may

be perfectly legal, though unseemly and reprehensible." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994).

In *McCoy v. Harrison*, 341 F.3d 600 (7th Cir. 2003), for example, an animal welfare investigator for the Illinois Department of Agriculture went to the plaintiff's property to inspect her dog kennels. As the investigator attempted to open one of the kennel gates, the plaintiff reached with her hand to slam the gate shut. *Id.* at 603. At that point, the investigator backhanded her on the face. The plaintiff fell to the ground, and when she looked up, the investigator was standing over her and was digging his hand into her arm. He then "let me go and just walked . . . back down the driveway." *Id.* The Seventh Circuit held that these actions did not constitute a seizure. The court explained, "[w]hile [the investigator's] actions may have caused [the plaintiff] injury, there is no evidence to show he intended to or did acquire physical control over her person." *Id.* at 606. *See also McKeown v. Hairston*, No. 05-73244, 2007 WL 1768767, at *2 (E.D. Mich. June 15, 2007) (no seizure occurred where police officer used deliberate physical force to shove the plaintiff out of the way, causing her to fall to the ground, but did not give any indication that she was not free to leave).

Plaintiff argues that Officer Bukovic seized her "[b]y taking hold of her, refusing her demand to release the initial hold and grasping her even more strongly." (Pl. Mem., at 3.) In Plaintiff's view, Officer Bukovic "denied her the liberty to leave the lay-a-way room for any other part of the Walmart store other than the 'Exit,'" and she was not able to "go about her business of aiding her son in filling out an accident report or to continue going about her shopping business in the Wal-mart store." (Pl. Resp., at 2, 3.)

The court agrees with Defendants that no seizure occurred at any time prior to or after the physical encounter between Plaintiff and Officer Bukovic. Throughout that period, Plaintiff remained free to leave the Wal-Mart store and go anywhere else she desired. *Cf. Brendlin*, 127 S. Ct. at 2405 (seizure occurs when "a reasonable person would have believed that he was not free to leave.")

As Defendants note, Officer Bukovic and Wal-Mart personnel affirmatively *wanted* her to leave. The mere fact that Plaintiff apparently wanted to stay in the store does not make Officer Bukovic's actions during this time a "seizure." *See Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994) (no seizure where fired law clerk was escorted out of the courthouse by court officers; law clerk was "free to go anywhere else that he desired," except the judge's chambers and the courthouse). Defendants' motion for summary judgment on the seizure claim is granted as to all non-physical interactions between Plaintiff and Officer Bukovic.

With respect to the physical encounter, on the other hand, summary judgment is not appropriate for either party. Viewing the facts in a light most favorable to Plaintiff, Officer Bukovic used physical force when he grabbed her and banged her arms against her neck, throat and chest, kicked her in the legs and kneed her in the groin. According to Plaintiff, Officer Bukovic was angry because she refused to give him her purse, and he threatened to place her in handcuffs. In addition, he only released his grip on Plaintiff when Paul came over and threatened him with a lawsuit.[10] The Supreme Court has noted that "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). While Officer Bukovic had a hold on Plaintiff's arms, she arguably was not free to leave and her movement was restrained. *See Maryland v. Wilson*, 519 U.S. 408, 420 n.8 (1997) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."); *Acevedo*, 457 F.3d at 724 ("The fact that the restraint on the individual's freedom of movement is brief makes no difference.")

---

[10] Defendants suggest that Plaintiff's version of events is so incredible that the court should reject it as a matter of law. (Def. Mem., at 12.) *See also Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) ("[T]estimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it.") Even accepting that Plaintiff's statements suffer from an air of implausibility, "[q]uestions of witness credibility typically rest with the jury, not the court." *United States v. Scott*, 145 F.3d 878, 883 (7th Cir. 1998). *See also Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 827 (N.D. Ill. 2002).

Similarly, viewing the facts in a light most favorable to Defendants, a reasonable jury could conclude that no seizure occurred at all. Johnson instructed Officer Bukovic that Plaintiff needed to leave the store because she was being disruptive, and Officer Bukovic relayed this information back to Plaintiff. Plaintiff ignored no fewer than three requests by Officer Bukovic that she leave, after which he placed one hand on Plaintiff's right forearm and one hand on her upper arm in a calm, escorting gesture designed to guide her out of the store. *See, e.g., Acevedo*, 457 F.3d at 725 ("Certain types of non-restraining physical contact, without a concomitant showing of authority, are just too minor to constitute a 'seizure' for Fourth Amendment purposes.") Plaintiff, however, "freaked out" and began flailing her arms and yelling, prompting Officer Bukovic to grab both of her arms – for no more than five seconds – in an attempt to prevent her from striking him and to calm her down.

There is a question of fact as to the nature of the physical interaction between Plaintiff and Officer Bukovic and, thus, summary judgment is not appropriate to either party on this portion of Plaintiff's claim that she was seized in violation of the Fourth Amendment.

## B. Reasonableness

Assuming Plaintiff is able to establish that a Fourth Amendment seizure occurred, there is also a question of fact as to whether Officer Bukovic's conduct was objectively reasonable. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This analysis is "not capable of precise definition or mechanical application," and the court must examine the "'totality of the circumstances' surrounding the incident." *Id.* (quoting *Garner*, 471 U.S. at 8-9). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting

15

arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 2004).

Defendants insist that Officer Bukovic's conduct was reasonable, noting testimony that (1) he was called to the Wal-Mart store for a disturbance involving a male and female; (2) June kept interrupting Officer Bukovic while he was trying to hear Stacey Johnson's version of events; (3) Plaintiff's voice was raised, and she was loud, boisterous and uncooperative; (4) Officer Bukovic asked Plaintiff to leave three or more times but she refused; (5) when Officer Bukovic attempted to gently escort Plaintiff from the premises, she "freaked out," began flailing her arms and yelling; and (6) Officer Bukovic held onto Plaintiff's arms for no more than five seconds; and (7) he offered her medical attention afterwards, which she declined. (Def. Resp., at 11-12.)

As discussed earlier, however, Plaintiff's version of events is entirely different. She claims that (1) she was calm when dealing with Wal-Mart personnel, and her interaction with Johnson was "amicable"; (2) Officer Bukovic gestured that he was going to grab her and/or her purse and she kept backing away from him; (3) Officer Bukovic became angry and hostile and grabbed her arms, which were crossed at her chest, and she placed them upwards as if to defend herself from an attack; (4) Officer Bukovic repeatedly "banged" her wrists against her chest, neck and throat area while kicking at her legs and hitting her once in the groin; (5) Officer Bukovic threatened to handcuff her; (6) Officer Bukovic only released her after Paul threatened him with a lawsuit; and (7) Officer Bukovic's actions caused her to urinate in her clothes and sustain a variety of injuries including

bruises, numbness, aggravated high blood pressure, and head, mouth and jaw pain.[11]  (June Dep., Ex. 5, at 105-06.)

Again viewing the facts in a light most favorable to Plaintiff, a jury could reasonably conclude that Officer Bukovic's conduct during his physical interaction with June was not reasonable under the circumstances.  At the same time, viewing the facts in a light most favorable to Defendants, a reasonable jury could conclude that Officer Bukovic's conduct during his physical interaction with Plaintiff was entirely reasonable under the circumstances.  Both parties' requests for summary judgment on this basis are denied.

## II.    The Fourteenth Amendment

Plaintiff's Complaint does not set forth a separate count for relief under the Fourteenth Amendment, but Count I includes the following allegation:  "Such conduct by Defendant BUKOVIC violated the right of JUNE O. CARLSON under the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable seizure and to receive due process of law."  (Cmplt. ¶ 34.)  Plaintiff does not mention the Fourteenth Amendment in her motion for summary judgment; Defendants, however, have argued extensively that in the event a jury finds that Plaintiff was not seized within the meaning of the Fourth Amendment, she cannot prevail on her alternate claim for violation of substantive due process rights under the Fourteenth Amendment.  (Def. Mem., at 6-10 (citing *Schaefer v. Goch*, 153 F.3d 793, 797 (7th Cir. 1998)) (where plaintiffs were not seized by police officers, they could recover only "by way of the Fourteenth Amendment's protection of substantive due process.")

_____

[11]    Plaintiff's additional arguments that the seizure was unreasonable because Officer Bukovic had no probable cause to arrest her for trespass or disorderly conduct are misplaced.  (Pl. Mem., at 3-4; Pl. Reply, at 5-10.)  As noted, Plaintiff has not stated a claim for false arrest and, thus, any purported lack of probable cause to arrest her for those crimes is irrelevant to her claim of unlawful seizure by use of excessive force in the nature of assault and battery.  *See Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 681 (7th Cir. 2007) (citing *Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir. 1987) ("False arrest and excessive force are unrelated except in forming a sequence. . . . evidence showing one form of misconduct is not relevant to establishing the other."))

Plaintiff barely responds to Defendants' arguments, stating only that: "the conduct of Officer Bukovic . . . against an octogenarian female does 'shock the conscience' when applying the rule that disputed facts shall be taken in a light most favorable to the non-moving party." (Pl. Resp., at 2.) The court nevertheless will address the claim. *See Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006) (plaintiff did not waive *Monell* claim by submitting "perfunctory and undeveloped" arguments where those arguments "depended entirely on the application of facts to the well-established *Monell* legal standard already presented in the defendants' brief.")

The Fourteenth Amendment due process guarantee protects "the individual against arbitrary action of government." *Schaefer*, 153 F.3d at 797. "Typically, an individual's Fourteenth Amendment due process rights are violated only if a government official's actions display a deliberate indifference to life or liberty that 'shocks the conscience.'" *Mandis v. City of Belleville*, No. 05-CV-642-DRH, 2006 WL 3487637, at *3 (S.D. Ill. Dec. 4, 2006) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). Negligence is not sufficient to meet the "shocks the conscience" standard. It requires "conduct intended to injure in some way unjustifiable by any government interest." *Foreman v. Johnson*, No. 03 C 187, 2006 WL 2714936, at *7 (N.D. Ill. Sept. 20, 2006) (quoting *Lewis*, 523 U.S. at 849). As the Supreme Court has explained, "only the most egregious conduct may be condemned under [this] approach." *Christensen v. County of Boone, IL*, 483 F.3d 454, 464 (7th Cir. 2007) (quoting *Lewis*, 523 U.S. at 846). "[T]he parameters of what constitutes violation of one's substantive due process rights is fluid and demands a case-by-case analysis of the facts." *Foreman*, 2006 WL 2714936, at *7 (quoting *Lewis*, 523 U.S. at 849).

Defendants argue that the facts of this case are analogous to those presented in *Slusher v. Carson*, 488 F. Supp. 2d 631 (E.D. Mich. 2007), in which deputies arrived on the plaintiffs' property with a warrant to search their barns for some tractors belonging to their neighbor. *Id.* at 634-35. The husband agreed to the search, but when his wife arrived and reviewed the court order, she objected. She also refused to give the court order back to the deputy, and when he reached

for it, she raised her hand in the air away from his grasp. *Id.* at 635. The deputy responded by pulling her arm down with one hand, and using his other hand to grab her right hand. He allegedly pressed his thumb into her hand and palm, squeezed the back of her hand, and twisted her fingers back and around. *Id.* at 635-36. Due to a preexisting condition, the plaintiff lost the use of her hand for several months, and suffered impaired range of motion in the hand and drastic loss of grip strength and fine motor skills. *Id.* at 636.

The district court held that this encounter did not violate the plaintiff's Fourteenth Amendment due process rights. In the court's view, the incident "more closely resembles those situations where officers must act in rapidly evolving, fluid, and [potentially] dangerous predicaments." *Id.* at 640. The force the deputy applied to the plaintiff's hand in an attempt to retrieve the paperwork was not "applied maliciously and sadistically for the very purpose of causing harm." *Id.* Nor did the deputy's actions evidence "deliberate indifference" to the plaintiff's rights such as to be "conscience shocking." *Id.* The court thus granted summary judgment in favor of the deputy.

In this case, Plaintiff admits that she refused to leave the Wal-Mart store despite being asked; Officer Bukovic was called to respond to a disturbance involving a male and a female patron; Plaintiff loudly protested and challenged Johnson's version of events; Plaintiff refused to turn over her purse – or any identification – to Officer Bukovic upon request; and Plaintiff backed away from him. At this point, Plaintiff says Officer Bukovic became hostile and angry and he then grabbed for her and/or her purse, banged her arms, kicked her, kneed her in the groin and threatened to handcuff her. The court agrees with Defendants that Officer Bukovic was reacting to a rapidly evolving, fluid situation when he reached for Plaintiff and/or her purse to obtain identification. *See Lewis*, 523 U.S. at 853 ("[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'")

Even assuming a jury credits Plaintiff's version of the subsequent events, moreover, Officer Bukovic's actions did not rise to the conscience-shocking level necessary to implicate the Fourteenth Amendment. Plaintiff acknowledges that Officer Bukovic was attempting to obtain her purse and/or identification in response to a disturbance call, and there is no evidence that he approached her with an intent to cause her injury. *See Bublitz v. Cottey*, 327 F.3d 485, 491 (7th Cir. 2003) ("[C]onduct *intended* to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.") (internal quotations omitted). To be sure, Officer Bukovic's actions may constitute assault or battery under state tort law, but "[t]he 'shocks the conscience' standard works to distinguish the due process guarantee from traditional standards of tort liability, so that the Fourteenth Amendment does not become a 'font of tort law.'" *Christensen*, 483 F.3d at 462 n.2.

The Supreme Court has stressed that "it is *a constitution* we are expounding," and "the Due Process Clause was intended to prevent government officials . . . from abusing [their] power, or employing it as an instrument of oppression." *Lewis*, 523 U.S. at 846 (internal quotations and citations omitted). Plaintiff has not demonstrated that Officer Bukovic acted deliberately to harm her and, thus, Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment claim is granted. *Christensen*, 483 F.3d at 464 ("[O]nly the most egregious conduct may be condemned under" the Fourteenth Amendment).

## III.    Qualified Immunity

Defendants argue that Officer Bukovic is nonetheless entitled to qualified immunity for his actions on January 3, 2005. Qualified immunity "serves to protect those public officials who have violated a constitutional right when the contours of that right were not sufficiently clear at the time to enable a reasonable official to know that his conduct was prohibited." *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007). The doctrine recognizes that "[i]t is sometimes difficult for an officer to determine how [a particular] legal doctrine . . . will apply to the factual

situation the officer confronts." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). The Supreme Court has articulated a two-part test for qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Chelios v. Heavener*, 520 F.3d 678, 2008 WL 746842, at *9 (7th Cir. Mar. 21, 2008) (citing *Saucier*, 533 U.S. at 201).

Having found a question of fact as to whether Officer Bukovic violated Plaintiff's Fourth Amendment rights during their physical encounter, the only question here is whether those rights were clearly established at the time of the alleged violation. The court first rejects Plaintiff's assertion that the relevant "clearly established" right relates in any way to the Illinois statutes governing disorderly conduct and trespass. (Pl. Reply, at 11-12.) Even assuming that Plaintiff was not in violation of either statute while on Wal-Mart's property, she has not cited any cases, nor is the court aware of any, suggesting that a store patron has a constitutional right to be free from police interference when the owner wants her to leave the premises and requests police assistance, but the patron has not engaged in criminal conduct.

The relevant right in this case is an individual's right to be free from unreasonable seizure or the use of excessive force. Plaintiff can defeat Officer Bukovic's qualified immunity defense by "(1) pointing to a closely analogous case that established a right to be free from the type of force [Officer Bukovic] used on h[er]; or (2) showing that the force was so plainly excessive that, as an objective matter, [Officer Bukovic] would have been on notice that [he was] violating the Fourth Amendment." *Chelios*, 2008 WL 746842, at *10 (quoting *Clash*, 77 F.3d at 1048).

Defendants argue that "[r]easonable officers in Officer Bukovic's position would not have known that placing his arms on a store patron in an effort to remove her from a store after requesting her to leave several times violated a clearly established constitutional right of Plaintiff." (Def. Resp., at 14.) Based on Defendants' version of events, the court agrees. Once again viewing the facts in a light most favorable to Plaintiff, however, the court finds that a reasonable officer

attempting to obtain a patron's purse or escort her out of a store would have known not to repeatedly "bang" an 80-year-old woman's arms against her neck, throat and chest, and kick her and knee her in the groin, particularly where the patron claims that she did nothing to provoke that level of attack. *See, e.g., Chelios*, 2008 WL 746842, at *9 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)) (to demonstrate that a constitutional right was clearly established, a plaintiff may show that "'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'") To this extent, Defendants' motion for summary judgment on the basis of qualified immunity is denied.

## IV.    Failure to Train

Count III of the Complaint asserts a § 1983 claim against the City of Darien for failure to train adequately Officer Bukovic, resulting in the violation of Plaintiff's constitutional rights. "A municipality may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). As noted, there is a question of fact as to whether Officer Bukovic violated Plaintiff's Fourth Amendment rights during their physical encounter. If not, the City cannot be liable. *Id.* ("[T]here can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.") *See also Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003) ("[A] plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under . . . failure to train.")

Assuming Officer Bukovic did violate Plaintiff's Fourth Amendment rights, the City may only be held liable for the violation if the inadequacy in training amounts to deliberate indifference to those rights. "Proof of deliberate indifference requires more than '[a] showing of simple or even heightened negligence.'" *Id.* (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)). Courts find deliberate indifference on the part of policymakers "only when such indifference may be considered a municipal policy or custom." *Id.* A municipality acts with

deliberate indifference when (1) "'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' that the deficiency exhibits deliberate indifference on the part of municipal policymakers"; or (2) "a repeated pattern of constitutional violations makes 'the need for further training . . . plainly obvious to the city policymakers.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 and n.10 (1989)).

Plaintiff's primary evidence in support of her failure to train claim involves the Darien police force's alleged lack of training regarding a specific provision of the Illinois Criminal Trespass statute, 720 ILCS 5/21-3. (Pl. Resp., at 4-5.) Plaintiff stresses that this provision allows an individual to remain in a lawfully entered building that is open to the public during normal business hours. To the extent Plaintiff has not stated a claim for false arrest based on any alleged criminal trespass, however, this statute – and Officer Bukovic's knowledge of it – has no bearing on whether he "seized" Plaintiff, or the reasonableness of his physical encounter with her.

Plaintiff does not dispute the extent of Officer Bukovic's training both before and during his employment with the Darien Police Department. As Defendants note, Officer Bukovic attended three separate police academies in Indiana, Illinois and California, graduating at the top of his class from his most recent six-month program with the California Highway Patrol. (Def. Facts ¶ ¶ 88, 89.) Officer Bukovic also worked and trained with several police departments, including the Lake County, Indiana Sheriff's Department, the Westmont Police Department, the California Highway Patrol and, finally, the Darien Police Department. He went through the Darien Police Department field training program, including about 16 weeks of on-the-job training plus a written exam regarding the "use of force." It is undisputed that Officer Bukovic passed the program and the exam. (*Id.* ¶ ¶ 88-90.)

More importantly, Plaintiff has not offered any evidence indicating that the training given to Officer Bukovic and other Darien officers was constitutionally infirm. Nor does she explain how the

training he received specifically in the area of excessive force was inadequate. The Seventh Circuit has made clear that "[i]n determining the adequacy of training, the focus must be on the program, not whether particular officers were adequately trained." *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). *See also Quade v. Kaplan*, No. 06 C 1505, 2008 WL 905187, at *14 (N.D. Ill. Mar. 31, 2008). In this regard, Plaintiff directs the court to three documents, none of which suffices to defeat summary judgment.

The first document is Officer Bukovic's May 15, 2004 written test regarding excessive force, on which he received a score of 100%. (Ex. 12.) The second and third documents are "Training Tasks" in the areas of "Crime vs. Property" and "Warrant/Summons Service." (Exs. 13, 14.) Plaintiff does not explain how the written test and Training Tasks reflect an inadequate training program in the area of excessive force or otherwise. Significantly, nothing in the record remotely suggests that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the deficiency exhibits deliberate indifference on the part of municipal policymakers." *Jenkins*, 487 F.3d at 492 (internal quotations omitted).

Nor is there any evidence that Office Bukovic has engaged in a repeated pattern of constitutional violations such that it would have been obvious to the City that he lacked adequate training. Defendants note that there has been only one other complaint of excessive force lodged against Officer Bukovic, which he received while employed by the Westmont Police Department. A motorist alleged that Officer Bukovic pushed him during a traffic stop, but the complaint was deemed unfounded. (Def. Facts ¶ 91.) Plaintiff concedes that she has no personal knowledge regarding either Officer Bukovic's training or this other complaint of excessive force. (*Id.* ¶ 92.) Thus, Defendants' motion for summary judgment on Plaintiff's failure to train claim is granted.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 61] is denied. Defendants' Motion for Summary Judgment [Doc. 57] is granted in part and denied in part.

Specifically, with respect to the Fourth Amendment claim, the motion is granted as to all non-physical interactions between Plaintiff and Officer Bukovic, but otherwise denied.  The motion is granted with respect to Plaintiff's Fourteenth Amendment and failure to train claims.

ENTER:

Dated: June 9, 2008

_____
NAN R. NOLAN
United States Magistrate Judge